**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                )
LISA ERBAN,                     )
                                )
                                )
                Plaintiff,      )
                                )        Civil Action
v.                              )        No. 22-11193-PBS
                                )
TUFTS MEDICAL CENTER            )
PHYSICIANS ORGANIZATION, INC.,  )
TUFTS MEDICAL CENTER PHYSICIANS )
ORGANIZATION, JOHN DOE, and     )
NICOLAS MARTIN,                 )
                                )
                Defendants.     )
_____)
```

**MEMORANDUM AND ORDER**

January 23, 2023

Saris, D.J.

Dr. John Erban worked more than thirty years at Tufts Medical Center as a physician specializing in oncology and hematology. In August 2019, Dr. Erban was diagnosed with glioblastoma, a terminal malignant tumor, which left him cognitively impaired. He passed away in September 2020. His widow, Plaintiff Lisa Erban, applied for life insurance benefits as the beneficiary, but was denied basic life and supplemental life insurance benefits. She alleges that Defendants breached their fiduciary duty in violation of the Employee Retirement Income Security Act ("ERISA") of 1974, 29 U.S.C. § 1132(a)(3) when they denied her benefits. Her primary

1

arguments are that (1) Tufts failed to inform her that she could continue her husband's life insurance benefits by continuing to pay premiums and (2) they did not completely and adequately inform her about the deadline for converting her husband's plan. Tufts asserts she was no longer a beneficiary under the policy on the date of her husband's death because the insurance lapsed when she and her husband failed to timely convert the group policy to an individual policy and that it did not violate any provisions in the plan.

Defendants filed a motion to dismiss under Rule 12(b)(6) (Dkt. 25). After hearing, the Court **DENIES** the motion to dismiss on the grounds Plaintiff Lisa Erban has stated a plausible claim that Defendants breached their fiduciary duty in light of their knowledge of Dr. Erban's impaired cognitive ability and that Nicolas Martin, an employee and Human Resources Director, acted as a fiduciary.

## FACTUAL BACKGROUND

The Amended Complaint alleges the following facts, some of which are disputed.

### I.    The Parties

#### A.   Plaintiff

Plaintiff Lisa Erban's late husband, John "Jack" Erban ("Dr. Erban"), worked as a physician at Tuft's Medical Center for over thirty years until he was diagnosed with a terminal brain tumor.

Erban was the designated beneficiary of Dr. Erban's basic and supplemental life insurance policies.

### B.   Defendants

Defendant Tufts Medical Center Physicians Organization, Inc. ("TMCPOI") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts. Defendant Tufts Medical Center Physicians Organization ("TMCPO") is the named Plan Administrator for TMCPOI's Welfare Benefit Plan under ERISA, 29 U.S.C. § 1001 et seq. TMCPO, as the Plan Administrator, serves as a fiduciary under ERISA. Collectively, TMCPOI and TMCPO will be referred to as "Tufts".

Defendant Nicolas Martin ("Martin") was an employee and one of the Directors of Tufts' Human Resource ("HR") Department.

### II.   Dr. Erban's Diagnosis and Death

On August 14, 2019, Dr. Erban went to the emergency room because he was acting unusually. There, he was diagnosed with a malignant glioblastoma tumor, a terminal illness. He underwent surgery the next day.

Due to his illness and surgery, Dr. Erban's cognitive abilities quickly declined: his executive functioning abilities were extremely impaired due to the removal of nearly his entire frontal lobe, he could not stay on task, he was often confused, and he experienced significant memory loss. Dr. Erban was evaluated by a neuropsychiatrist who determined he was unable to practice

medicine, and as a result, he never returned to work after August 14, 2019. Defendants were fully aware of Dr. Erban's cognitive deficiencies and impairment.

Beginning on September 10, 2019, Dr. Erban received chemotherapy and radiation treatment for his cancer. Despite this treatment, Dr. Erban died from his illness on September 2, 2020, just over a year after his diagnosis. He was 65 years old.

### III.    The Insurance Policy

#### 1.   Dr. Erban's Coverage

While employed by Tufts, Dr. Erban was a plan participant in Tufts' life insurance plan No. 503 (the "Plan"). The Plan was designated as a Welfare Benefits Plan under ERISA. Per the Plan, Dr. Erban received basic life insurance in the amount of $400,000, with monthly premiums paid for by his employer as part of his employment benefits. Additionally, Dr. Erban possessed supplemental life insurance in the amount of $400,000, for which he paid a monthly premium withdrawn from his paycheck. Both insurance policies were issued by The Hartford Life Insurance Company ("Hartford"). Dr. Erban's wife, Lisa Erban, was the designated beneficiary for both the basic and supplemental life insurance policies.

### 2.   The Plan's Terms

The Plan provides that coverage will end on the <u>earliest</u> of the following:

1) the date the [Plan] terminates;
2) the date You are no longer in a class eligible for coverage, or The [Plan] no longer insures Your class;
3) the date the premium payment is due but not paid;
4) the date Your Employer terminates Your employment;
5) the date You are no longer Actively at Work; or
6) the date Your employer ceases to be a Participating Employer;

unless continued in accordance with any of the Continuation Provisions.

Dkt. 14-2 at 3 (emphasis added). Central to this dispute are certain Continuation Provisions in the Plan:

**Continuation Provisions:** Can my coverage and coverage for my Dependents be continued beyond the date it would otherwise terminate?

Coverage can be continued by Your Employer beyond a date shown in the Termination provision, if Your Employer provides a plan of continuation which applies to all employees in the same way. Coverage may not be continued under more than one Continuation Provision.

The amount of continued coverage applicable to You or Your Dependents will be the amount of coverage in effect on the date immediately before coverage would otherwise have ended. Continued coverage:
1) is subject to any reductions in The [Plan];
2) is subject to <u>payment of premium</u>;
3) may be continued up to the maximum time shown in the provisions; and
4) terminates if:
   a. The [Plan] terminates; or
   b. Your Employer ceases to be a Participating Employer.

Dkt. 14-2 at 4 (emphasis added). Importantly, the Plan does not limit who may pay the premium for a Continuation Provision.

Under the Sickness or Injury Continuation Provision:

If You are not Actively at Work due to sickness or
injury, all of Your coverages (including Dependent Life
coverage) may be continued:
    1) for a period of 12 consecutive month(s) from the
       date You were last Actively at Work; or
    2) if such absence results in a leave of absence in
       accordance with state and/or federal family and
       medical leave laws, then the combined
       continuation period will not exceed 12
       consecutive month(s).

Dkt. 14-2 at 5.

Finally, the Plan provides for a waiver of premium if the Plan Participant is disabled. "Waiver of Premium is a provision which allows You to continue Your . . . Life Insurance Coverage without paying premium, while You are Disabled and qualify for Waiver of Premium." Dkt. 14-2 at 5. A Plan Participant qualifies for the Waiver if they were under age 60 when they became disabled. Id. at 6.

### 3. Communication with the Defendants

After Dr. Erban's diagnosis, he was placed on medical leave and paid his full salary for six months in accordance with his employment contract. During this time, TMCPOI continued to pay the full amount of his basic life insurance premium and the premium for his supplemental insurance continued to be automatically withdrawn from his paycheck. While on medical leave, Dr. Erban also applied for and received long-term disability ("LTD") benefits under a benefit plan offered by TMCPOI.

Before his six-month guaranteed salary ended, TMCPOI directed the Erbans to communicate with employees of Tufts' HR Department concerning the preservation of Dr. Erban's benefits. On December 13, 2019, Dr. Erban emailed Martin with a series of questions concerning his LTD benefits and the continuation of his life insurance coverage. In this email, he also asked Martin to "summarize any other benefits I am currently receiving that I need to consider replacing." Dkt. 19 ¶ 37, at 5. Dr. Erban copied his wife and sister, Barbara Weinstein, in the email, indicating they would be assisting him.

Martin replied to Dr. Erban's December email that same day with answers to his questions, the LTD plan document, and an insurance "conversion" form. Martin knew Dr. Erban wanted to convert his group life insurance policy to an individual policy. In an email chain beginning December 24, 2019, Ms. Weinstein asked follow-up questions and requested proper forms for converting Dr. Erban's life insurance policy. On December 30, 2019, Martin sent the correct form for converting the life insurance policy. However, he never informed Lisa Erban or Ms. Weinstein that Dr. Erban was entitled to keep his life insurance policy in place for twelve months after his last day of work (i.e., from August 14, 2019 to August 14, 2020) if his premiums were paid.

On December 30, 2019, Hartford sent a letter to Dr. Erban informing him of the Policy's "Sickness or Injury Continuation"

7

provision that allowed his life insurance coverage to remain in effect for twelve months after his last day of work if his employer continued to make premium payments. The letter also informed Dr. Erban that after his life insurance policy terminated, he had thirty-one days to convert the policy to an individual policy. That same day, Hartford sent a letter to Karen Leibold, also a Director of TMCPOI and TMCPO's HR Department, informing her of the same information and noting that if Tufts ceases premium payments, she "must provide [the] employee the Notice of Conversion and/or Portability Rights form immediately upon coverage termination." Id. at ¶ 45, at 6.

During the period of time between Dr. Erban's diagnosis and his termination, the HR staff knew that the Erbans' main focus was to "assure continuance of active status" of his life insurance policy. Id. at ¶ 47, at 6-7. At this time, Tufts also knew of Dr. Erban's diagnosis, his cognitive deficiencies, and his inability to return to work.

When his six-month salary guarantee ended on February 14, 2020, TMCPOI terminated Dr. Erban's employment. Ten days earlier, TMCPO sent a letter to Dr. Erban stating that "your life insurance terminates on your termination date (February 14, 2020)" and that he had the option to convert his group policy to an individual policy within thirty-one days of his termination. Id. at ¶ 50, at 7. The letter did not state that Dr. Erban's life insurance

coverage would continue for twelve months after termination if the premium continued to be paid, nor did it state that TMCPO would stop making premium payments on Dr. Erban's policy.

The February 4, 2020 letter to Dr. Erban allegedly misrepresented the terms of the plan by stating that the option to port his supplemental life insurance was "not available if termination is due to retirement or disability." Id. at ¶ 52, at 7.

On February 4, 2020, Lisa Erban emailed Martin to request information regarding COBRA benefits, stating "I just want to make sure there is no lapse in coverage." Id. at ¶ 54, at 8. Martin's response did not include any information about the possibility of the policy remaining in effect until August 14, 2020 if premiums continued to be paid, that TMCPOI would stop making payments with the termination of Dr. Erban, or that the life insurance policy would lapse if the conversion form was not received within thirty-one days of termination.

In addition, Lisa Erban, as beneficiary, was not informed that her husband's insurance policy could remain in effect until August 14, 2020 if the premium continued to be paid, that TMCPO stopped making payments, that Dr. Erban had a supplemental policy, or that payments for the supplemental policy on February 14, 2020. Lisa Erban asserts that had she been aware, she would have paid the premiums herself to continue Dr. Erban's life insurance

policies. She also alleges that she was not aware of the conversion option and that the deadline to convert the policy had lapsed.

### 4.   Hartford's Denial of Plaintiff's Claim

Ms. Weinstein emailed Martin on September 14, 2020, to inform him of Dr. Erban's passing and to ask a question about Dr. Erban's 2019 bonus. The next day, Martin emailed Lisa Erban and Ms. Weinstein stating that:

> The Hartford, our life insurance carrier reached out to me yesterday and they thought he might still be eligible for a payout under the policy. I submitted the claim. Lisa is listed as the beneficiary if the claim is approved.

Dkt. 19 ¶ 59, at 8.

On October 13, 2020, Hartford contacted Martin to ask if Tuffs had paid premiums on the policy post-termination. Martin advised informed Hartford that premiums were not paid: "[o]nce someone terminates, the employer is not involved with continued premiums. He terminated in February, so it would be up to the employee to request a continuation of coverage directly through The Hartford." Id. at ¶ 62, at 9.

Six months after Martin submitted the claim, Hartford informed Lisa Erban it was denying the claim for payment under her husband's life insurance policy for three reasons: (1) premium payments had stopped in February of 2020, therefore terminating the policies; (2) no conversion form was received by Hartford within thirty-one days after the policy terminated; and (3) Dr.

10

Erban was not entitled to waiver of premium provisions in the because he became disabled after the age of sixty. Lisa Erban appealed the denial to Hartford by letters dated November 29, 2021 and February 10, 2022 and to TMCPO by letters dated November 29, 2021 and March 8, 2022. On February 23, 2022, Hartford denied Lisa Erban's appeal. TMCPO never responded to Lisa Erban's appeal or claim letter.[1]

## DISCUSSION

### I.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Id. at 555 (cleaned up); see also Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95-96 (1st Cir. 2007).

The plausibility standard requires the court to proceed in two steps. First, the court must "separate the complaint's factual allegations (which must be accepted as true) from its conclusory

---

[1] Lisa Erban maintains that she is not required to exhaust her administrative remedies. She affirms, however, that if she was, "she has exhausted all pre-suit administrative remedies and this action is ripe for litigation under the ERISA statute." Dkt. 19 ¶ 70, at 10.

legal allegations (which need not be credited)." <u>Morales-Cruz v. Univ. of P.R.</u>, 676 F.3d 220, 224 (1st Cir. 2012). Second, the court must determine whether the factual allegations permit it "to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).

When assessing a Rule 12(b)(6) motion, the court should consider the complaint and any documents attached to it. <u>See Trans-Spec Truck Serv. v. Caterpillar Inc</u>., 524 F.3d 315, 321 (1st Cir. 2008) (noting "the district court may properly consider only facts and documents that are part of or incorporated into the complaint," including exhibits attached to the complaint). Courts can also consider "documents the authenticity of which are not disputed by the parties," as well as "official public records," "documents central to plaintiffs' claim," and "documents sufficiently referred to in the complaint." <u>Gargano v. Liberty Int'l Underwriters, Inc.</u>, 572 F.3d 45, 47 n.1 (1st Cir. 2009) (quoting <u>Watterson v. Page</u>, 987 F. 2d 1, 3-4 (1st Cir. 1993)); <u>see also Clorox Co. P.R. v. Proctor & Gamble Com. Co.</u>, 228 F.3d. 24, 32 (1st Cir. 2000) (holding that, in considering a motion to dismiss, a court may "consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint"). Accordingly, the Court may consider

the plan documents attached to Defendants' Motion to Dismiss without converting the motion to one for summary judgment.

## II.   **Analysis**

### A. The Legal Standard for Breach of Fiduciary Duty

Lisa Erban alleges that Defendants breached their fiduciary duty under ERISA, 29 U.S.C. § 1132(a)(3). Section 1132(a)(3) allows a "participant, beneficiary, or fiduciary" to bring forth a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The Supreme Court has interpreted this provision to serve as a "safety net, offering appropriate equitable relief for injuries caused by violations that [29 U.S.C. § 1132] does not elsewhere adequately remedy." Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 110 (1st Cir. 2002) (quoting Varity Corp. v. Howe, 516 U.S. 489, 512 (1996)).

Under ERISA, a fiduciary must follow a "prudent man standard of care," which entails that

> a fiduciary shall discharge his duties with respect to
> a plan solely in the interest of the participants and
> beneficiaries and . . . with the care, skill, prudence,
> and diligence under the circumstances then prevailing
> that a prudent man acting in a like capacity and familiar

> with such matters would use in the conduct of an
> enterprise of a like character and with like aims.

29 U.S.C. § 1104(a)(1). "ERISA's specific statutory duties are not meant to be exhaustive of a fiduciary's obligations; federal courts are expected to flesh out ERISA's general fiduciary duty clause, 29 U.S.C. § 1104(a)." Barrs v. Lockheed Martin Corp., 287 F.3d 202, 207 (1st Cir. 2002).

Fiduciaries have an affirmative duty to provide information "of material facts" about a plan, "if there was some particular reason that the fiduciary should have known that his failure to convey the information would be harmful. A failure to inform is a fiduciary breach only where the fiduciary 'knew of the confusion [detrimental to the participant] generated by its misrepresentations or its silence.'" Watson, 298 F.3d at 114–15 (cleaned up). However, "fiduciaries need not generally provide individualized unsolicited advice." Id. at 115; see also Barrs, 287 F.3d at 207–08 ("Absent a promise or misrepresentation, the courts have almost uniformly rejected claims by plan participants or beneficiaries that an ERISA administrator has to volunteer individualized information taking account of their peculiar circumstances."). However, "[w]here the employer makes a specific commitment to notify a beneficiary about a specific event relating to plan benefits, it is at least arguable that the employer breaches its fiduciary duty if it fails to do so." Id. at 210.

In certain circumstances, a fiduciary has an obligation to accurately convey material information to beneficiaries, including material information that the beneficiary did not specifically request. Watson, 298 F.3d at 114 (citing to the Third, Fourth, Sixth, Seventh, Ninth, and D.C. Circuits, which have concluded that there is a duty to accurately convey complete and accurate information, even when not specifically asked); see also Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 644 (8th Cir. 2007) ("[A] fiduciary has a duty to inform when it knows that silence may be harmful . . . and cannot remain silent if it knows or should know that the beneficiary is laboring under a material misunderstanding of plan benefits.") (cleaned up); Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 380-81 (4th Cir. 2001) ("[T]he duty to inform 'entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.' . . . [A]n ERISA fiduciary that knows or should know that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent -- especially when that misunderstanding was fostered by the fiduciary's own material representations or omissions.").

Relevant here, a duty to inform is triggered when a fiduciary is aware that a plan participant or beneficiary has a severe illness or is otherwise incapacitated. One instructive case is

15

Eddy v. Colonial Life Ins. Co. of Am., 919 F.2d 747, 748 (D.C. Cir. 1990). In Eddy, the plaintiff plan participant was HIV-positive and was given one year to live; he called the fiduciary because he believed his insurance was ending. Id. at 748-49. Relying on the common law of trusts, the D.C. Circuit ruled that "[o]nce Eddy presented his predicament," the insurance company had "to do more than simply not misinform," but had an "affirmative obligation to inform -- to provide complete and correct material information on Eddy's status and options." Id. at 751. This duty included providing "information material to Eddy's circumstance," consisting of sharing information regarding continuation provisions, conversion options, and the process to convert or continue life insurance. Id.; see also Vest v. Resolute Forest Products US, Inc., No. 1:17-cv-196, 2017 WL 6375964, at *4 (E.D. Tenn. Dec. 13, 2017), aff'd, 905 F.3d 985 (6th Cir. 2018)(citing cases regarding duty to inform and finding that there is a duty "when the plaintiff shows unique facts or circumstances that require the fiduciary to do more than is generally required by ERISA"); Palen v. Kmart Corp., No. 97-2269, 2000 WL 658115, at *4 (6th Cir. May 9, 2000) (affirming that the employer's duty to provide information about how to continue benefits the employer administered was triggered when the employer was aware of the employee's illness, if not his impending death); Krohn v. Huron Mem'l Hosp., 173 F.3d 542, 549-51 (6th Cir. 1999) (holding that

the hospital breached its fiduciary duty to inform when, after receiving notice that the plan beneficiary would be eligible for and needed LTD benefits, it provided misleading, incomplete, and inaccurate information instead).

Lastly, there is a breach of duty where a beneficiary, or individual acting on behalf of a beneficiary, seeks information from the fiduciary who provides misleading or inaccurate information as a result. See Brenner v. Metro. Life Ins. Co., No. 11-12096, 2015 WL 1307394, at *1 (D. Mass. Mar. 23, 2015) (concluding that there could be a breach of an affirmative duty to inform where a beneficiary sought information from an HR Director about how to continue a group policy insurance, informed HR of the plan participant's serious illness, and was never told the group policy would end nor was given notice of the right to convert); Bixler v. Cent. Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1302 (3d Cir. 1993) (explaining a breach of fiduciary duty is possible where a beneficiary of a plan called with a specific question about a death benefit, the fiduciary had knowledge that the plan participant was ill and had significant unpaid medical expenses, but the fiduciary still failed to advise the beneficiary to sign a notice for COBRA).

## B. Alleged Breach of Fiduciary Duty

Before determining whether the Defendants breached their fiduciary duty, the Court must resolve disputes about the meaning

of the plan terms. ERISA fiduciaries must "act in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D); Coffin v. Bowater Inc., 501 F.3d 80, 86 (1st Cir. 2007). Like other contracts, ERISA plans are "construed according to their written terms." Riley v. Metro. Life Ins. Co., 744 F.3d 241, 249 (1st Cir. 2014) (citing US Airways, Inc. v. McCutchen, 569 U.S. 88, 102 (2013)). "The provisions of an ERISA plan must be read in a natural, commonsense way." Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 66 (1st Cir. 2013). Therefore, courts "do justice" by enforcing the plain terms of the plan. Riley, 744 F.3d at 250.

### 1.   Sickness or Injury Provision

Lisa Erban contends that Defendants breached their fiduciary duty by not telling her about the "Sickness or Injury" Continuation Provision. Defendants insist that the Sickness or Injury Continuation Provision does not apply. They argue Dr. Erban's "group life insurance coverage ended because his employment terminated, not because he was on leave due to an Injury or Illness and not 'Actively at Work.'" Dkt. 35 at 6. This argument is unpersuasive.

Defendants misconstrue the plain language of the Plan read as a whole. The Plan indicates that a Continuation Provision applies "beyond the date [coverage] would otherwise terminate." Dkt. 14-2

at 4. The Sickness or Injury Continuation Provision does not limit the continuation of coverage due to termination. Under that Provision, coverage may be continued "for a period of 12 consecutive month(s) from the date [Dr. Erban was] last Actively at Work." Dkt. 14-2 at 5. Accordingly, by the plain meaning of the Plan, Dr. Erban's coverage can continue "subject to payment of premium." Id. at 4.

Next, Defendants argue that even if the Sickness or Injury Continuation Provision applied, the Complaint does not allege that "the employer here had a plan of continuation that applied to each employee the same." Dkt. 35 at 7. However, the Complaint alleges that the Sickness or Injury Provision applies. For example, the Complaint points out that Hartford analyzed the Sickness or Injury Provision in determining Dr. Erban's coverage.

Alternatively, Defendants argue that the Plan does not "provide[] any right to a participant to continue coverage under the Plan's life insurance benefits after termination of employment simply by submitting premiums." Dkt. 35 at 7. They insist that the only way to continue coverage is by converting the Plan. However, the plain language of the Plan contradicts this argument. As indicated above, the Continuation Provisions allow for coverage to extend beyond the termination of coverage "subject to payment of [the] premium." Dkt. 14-2 at 4. The Plan does not limit who must pay the premium for coverage to continue. Therefore, the Plan

provides a right for a participant to continue coverage by paying the premium herself. By comparison, the Court takes notice that Hartford's LTD Plan specifies that continued coverage is "subject to payment of premium by the Employer." Dkt. 14-3 at 4. The absence of any qualifier in the Plan bolsters Lisa Erban's argument that she could pay the premium herself to continue coverage.

Accordingly, Lisa Erban pleads sufficient facts to support the claim that Defendants breached their fiduciary duty by not affirmatively informing her of the option to continue paying premiums to continue her basic and supplemental insurance coverage.

### 2.  *Right to Convert*

Defendants also had an affirmative duty to inform Lisa Erban fully and plainly, as beneficiary, that failure to file the conversion form would result in the loss of benefits because they were not continuing to pay premiums. Defendants "were fully aware of Dr. Erban's terminal cancer diagnosis, his cognitive deficiencies and impairment, and his inability to return to work as a physician." Dkt. 19 ¶ 25 at 3. See Eddy, 919 F.2d at 751; Watson, 298 F.3d at 114–15. While Dr. Erban, as Plan Participant, received the conversion letter and form, he was allegedly cognitively disabled at the time of receipt. Even though she was copied on the emails from Martin, Lisa Erban alleges that she did not know about the need to convert within 30 days of termination

20

of employment. Defendants knew that Lisa Erban was relying on Tufts to make sure there was no lapse in coverage: "TMCPOI directed the Erbans to communicate with employees of TMCPO's and/or TMCPOI's [HR] department concerning the preservation of Dr. Erban's benefits." Dkt. 19 ¶ 29, at 4. Lisa Erban notified Martin that she wanted to ensure "there [was] no lapse in coverage." Id. at ¶ 54, a 8. She affirmatively asked for help.

However, Defendants allegedly did not inform Lisa Erban (1) that TMCPOI stopped making premium payments on the life and supplemental insurance policies, (2) that Dr. Erban had a supplemental insurance policy, (3) that there was an option to convert either policy, (4) that she had the option to port both policies to a group portable policy, and (5) that she could have made premium payments to continue coverage until August 2020. In light of Mr. Erban's decline, eventual certain death, and Lisa Erban's plea for help, she has stated a plausible claim that the failure to provide this information to her constituted a violation of Defendants' affirmative duty owed to her.

### C. Mr. Martin as a Fiduciary

Lisa Erban alleges that Martin acted as an ERISA fiduciary. The Supreme Court held that an individual may act as a fiduciary when they "answer[] beneficiaries' questions about the meaning of the terms of a plan so that those beneficiaries can more easily obtain the plan's benefits." Varity Corp., 516 U.S. at 502-03; see

Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 88 (2d
Cir. 2001) (concluding that "[the employer] may have been acting
as a fiduciary when it communicated with its employees and retirees
concerning the contents of the welfare benefits plan"); see also
Taylor v. Peoples Nat. Gas Co., 49 F.3d 982, 985-89 (3d Cir. 1995)
(indicating that an employee who was authorized to advise employees
of their rights and options under the ERISA plan and who was
understood to be the person to speak to regarding the pension plan
was acting to assist the plan administrator in discharging its
fiduciary duties).

One helpful case on point is Brenner v. Metro. Life Ins. Co.
There, the Court held that an employee of the Plan Administrator
can be a fiduciary where the employee goes beyond "mere ministerial
tasks." Brenner, 2015 WL 1307394, at *13-14. There, Dr. Brenner
worked for Southboro Medical Group ("SMG") and participated in a
benefit plan administered by SMG, which included group life
insurance. Id. at *2. Kathryn Tomashunas was SMG's HR Director who
regularly communicated with Lynn Brenner, Dr. Brenner's wife,
about preserving Dr. Brenner's benefits after he suffered from a
neurological autoimmune disease that left him unable to work. Id.
at *3. Tomashunas did not provide material information to Ms.
Brenner that ultimately led to the denial of life insurance
benefits after Dr. Brenner's passing. Id. at *3-*4. Ms. Brenner

filed suit against Metlife, the insurance issuer, and SMG. Id. at
4. Tomashunas

> developed a relationship of trust with [Ms. Brenner];
> took an active role in ensuring that Dr. Brenner's life
> insurance coverage remained intact; made ill-informed
> decisions about whether Dr. Brenner should apply for a
> conversion without consulting the plan materials or [Ms.
> Brenner]; and repeatedly communicated with [Ms. Brenner]
> about the insurance requirements in such a way as to
> suggest to her that she was following the requirements
> for keeping the insurance coverage intact.

Id. at *12. Critically, Tomashunas "repeatedly reassured [Ms.

Brenner] that she was properly securing insurance, without ever

warning [Ms. Brenner] that her advice might be incorrect or that

[she] should consult the Plan Documents for correct information."

Id. at 13.

Here, Tufts directed the Erbans to communicate with the HR

department to preserve Dr. Erban's benefits. The Erbans

> needed and asked the HR department for help. They
> developed a working relationship with the HR department
> and reasonably relied upon its employees to work
> together with them to preserve all benefits available to
> Dr. Erban, to explain and employ all options to preserve
> or continue all available benefits, and to guide them
> through the benefits preservation and continuation
> process.

Dkt. 19 ¶ 32, at 4.

The Complaint alleges that Martin "knew that Dr. Erban was

terminally ill, would never return to the practice of medicine,

was cognitively impaired, and that his life insurance benefits

were acutely important to continue or preserve." Id. at ¶ 39, at

5. Martin communicated with Dr. Erban, Ms. Weinstein, and his wife where he answered Dr. Erban's questions, encouraged Dr. Erban to ask him more questions, and participated in phone calls to discuss the continuation of coverage. Thus, Lisa Erban has made a plausible claim alleging that Martin developed a position of trust with the Erbans, went beyond conducting "mere ministerial tasks," and affirmatively took on the responsibility in making sure there was no lapse in benefits. See Brenner, 2015 WL 1307394, at *13; see also Livick v. The Gillette Co., 524 F.3d 24, 29 (1st Cir. 2008) (distinguishing the case, where the HR representative acted ministerially, from those where an individual may be a fiduciary if they provide the employee with "misleading information while seeking advice about the security of his future benefits").

### D. Waiver of Arguments

Because the Defendants failed to address Count II in their Motion to Dismiss, the argument is waived.

### ORDER

For the foregoing reasons, Defendants' Motion to Dismiss (Dkt. 25) is **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge

24