**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                )
LISA ERBAN,                     )
                                )
                Plaintiff,      )
                                )         Civil Action
v.                              )         No. 22-cv-11193-PBS
                                )
TUFTS MEDICAL CENTER PHYSICIANS )
ORGANIZATION, INC., TUFTS MEDICAL)
CENTER PHYSICIANS ORGANIZATION, )
NICHOLAS MARTIN, and JOHN DOE,  )
                                )
                Defendants.     )
_____)
```

**MEMORANDUM AND ORDER**

August 12, 2025

Saris, J.

Dr. John Erban worked for over thirty years at Tufts Medical Center as a physician specializing in oncology and hematology. His career with Tufts ended abruptly when, in August 2019, he was diagnosed with glioblastoma, a terminal malignant tumor that left him cognitively impaired. He passed away in September 2020. Dr. Erban's widow, Plaintiff Lisa Erban, applied for life insurance benefits as the beneficiary of his life and supplemental life insurance, but the Hartford Life & Accident Insurance Company ("Hartford") denied her benefits.

Lisa Erban then brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

1

§§ 1001, _et seq._, against three defendants: (1) Tufts Medical Center Physicians Organization, Inc. ("TMCPOI"), her husband's employer; (2) Tufts Medical Center Physicians Organization ("TMCPO"), the listed Plan Administrator; and (3) Nicholas Martin, Tufts' Director of Human Resources ("HR"). She brings two claims under 29 U.S.C. § 1132(a)(3). She alleges first that Defendants breached their fiduciary duties, causing Hartford's benefit denial; and second, that she detrimentally relied on Defendants' material omissions and misrepresentations, entitling her to equitable estoppel.

Lisa Erban and Defendants have filed cross-motions for summary judgment. After a hearing, the Court **ALLOWS** Defendants' motion for summary judgment (Dkt. 85) with respect to Lisa Erban's basic life insurance conversion claim and otherwise **DENIES** the motion. The Court **ALLOWS** Lisa Erban's motion for summary judgment (Dkt. 89) with respect to her continuation claim and supplemental claim.

## FACTUAL BACKGROUND

The following facts are undisputed, except where otherwise noted. _See_ Deaton v. Town of Barrington, 100 F.4th 348, 353 (1st Cir. 2024).

I.    **The Parties**

   A.    **Plaintiff**

Plaintiff Lisa Erban is the widow of Dr. Erban, who worked as a physician at Tufts Medical Center for over thirty years until he was diagnosed with a terminal brain tumor.

   B.    **Defendants**

Dr. Erban was an employee of TMCPOI. TMCPOI's benefits provided its employees with basic and supplemental life insurance plans. Both plans were governed by the "Basic Dependent Life, Basic Term Life, Supplemental Term Life, Basic Accidental Death and Dismemberment" plan document ("the Plan"). The Plan is a welfare benefits plan under ERISA, and TMCPO is the named Plan Administrator. TMCPO, as the Plan Administrator, serves as a fiduciary under ERISA. Collectively, TMCPOI and TMCPO will be referred to as "Tufts."

Hartford issued the life insurance benefits provided to TMCPOI's employees. The Plan granted Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." Dkt. 88-2 at 41. Participants and beneficiaries of the Plan would contact TMCPOI's HR department with benefits-related questions. However, participants and beneficiaries sometimes needed to ask Hartford directly for clarification. Defendant Nicholas Martin was the director of TMCPOI's HR department. If Martin was unsure of a term

in the Plan, he reached out to TMCPOI's insurance broker or Hartford for guidance and clarification.

## II.  __Dr. Erban's Diagnosis and Death__

On August 14, 2019, Dr. Erban went to the emergency room because he was acting unusually. There, he was diagnosed with a malignant glioblastoma tumor, a terminal illness. He underwent surgery the next day.

Martin disputes that he was fully aware of Dr. Erban's condition. At a minimum, Martin knew Dr. Erban had surgery for a brain tumor and took leave under the Family and Medical Leave Act.

Because Dr. Erban's illness prevented his return to work, TMCPOI terminated Dr. Erban on February 12, 2020. Dr. Erban died from his illness on September 2, 2020, just a year after his diagnosis. He was 65 years old.

## III. __The Insurance Policy__

### A.   __Dr. Erban's Coverage__

While employed by Tufts, Dr. Erban was a plan participant in Tufts' life insurance plan. Per the Plan, effective January 1, 2019, Dr. Erban received basic life insurance in the amount of $401,000, with monthly premiums paid by his employer as part of his employment benefits. Additionally, Dr. Erban elected for supplemental life insurance in the amount of $400,000, for which he paid a monthly premium. His wife Lisa Erban was the designated

beneficiary for both the basic and supplemental life insurance policies.

**B.    The Plan's Terms**

The Plan provides that life insurance coverage will end on "the last day of the month following" the <u>earliest</u> of any of these dates:

> 1) . . . the date The [Plan] terminates;
> 2) . . . the date You are no longer in a class eligible for coverage, or The [Plan] no longer insures Your class;
> 3) . . . the date the premium payment is due but not paid;
> 4) . . . the date Your Employer terminates Your employment;
> 5) . . . the date You are no longer Actively at Work; or
> 6) . . . the date Your employer ceases to be a Participating Employer;
>
> unless [coverage is] continued in accordance with any of the Continuation Provisions.

Dkt. 88-2 at 13. Central to this dispute are certain Continuation Provisions in the Plan:

> <u>Continuation Provisions</u>: Can my coverage and coverage for my Dependents be continued <u>beyond the date it would otherwise terminate</u>?
>
> Coverage can be continued by Your Employer beyond a date shown in the Termination provision, <u>if Your Employer provides a plan of continuation which applies to all employees the same way</u>. Coverage may not be continued under more than one Continuation Provision.
>
> The amount of continued coverage applicable to You or Your Dependents will be the amount of coverage in effect on the date immediately before coverage would otherwise have ended. Continued coverage:
>
> 1) is subject to any reductions in The [Plan];

    2) is subject to payment of premium;
    3) may be continued up to the maximum time shown in the
       provisions; and
    4) terminates if:
        a) The [Plan] terminates; or
        b) Your Employer ceases to be a Participating
           Employer.

Id. at 14 (emphasis added). Importantly, the Plan does not limit who may pay the premium for a Continuation Provision.

One particular Continuation Provision, which permits coverage to be continued "beyond the date it would otherwise terminate," id., is the "Sickness or Injury" Continuation Provision. Under this provision:

If You are not Actively at Work due to sickness or injury, all of Your coverages (including Dependent Life coverage) may be continued:

    1) for a period of 12 consecutive month(s) from the
       date You were last Actively at Work; or
    2) if such absence results in a leave of absence in
       accordance with state and/or federal family and
       medical leave laws, then the combined
       continuation period will not exceed 12
       consecutive month(s).

Id. at 15. Lisa Erban asserts that this provision constitutes "a plan of continuation which applies to all employees the same way." Id. at 14.

Finally, the Plan creates a "right to convert" terminated life insurance coverage. Id. at 18.

Conversion: How do I convert my coverage or coverage for my Dependents?

To convert Your coverage or coverage for Your Dependents, You must:

```
1) complete a Notice of Conversion Right form; and
2) have your Employer sign the form.

The Insurer must receive this within:

1) 31 days after Life Insurance terminates; or
2) 15 days from the date Your Employer signs the form;
whichever is later. However, We will not accept requests
for Conversion if they are received more than 91 days
after Life Insurance terminates.
```

Id.

### IV.  **Communication with the Defendants**

After Dr. Erban's diagnosis, he was placed on medical leave and paid his full salary for six months in accordance with his employment contract. During this time, TMCPOI continued to pay the full amount of his basic life insurance premium, and the premium for his supplemental insurance continued to be automatically withdrawn from his paycheck. While on medical leave, Dr. Erban also applied for and received long-term disability ("LTD") benefits under a benefit plan offered by TMCPOI.

Before his six-month guaranteed salary ended, the Erbans and Dr. Erban's sister, Barbara Weinstein, a former administrator at UMass Memorial Health, communicated with Martin about the preservation of Dr. Erban's benefits. Martin encouraged the Erbans to ask him questions.

On December 6, 2019, Lisa Erban emailed Martin asking whether the Erbans "could just private pay our curr[e]nt health plan with

Tufts and Life Insurance" in the event Dr. Erban could not return
to work. Dkt. 90-8 at 4. That same day, Martin responded:

> We have a term life policy which basically means when
> you terminate employment the life insurance policy goes
> away. They do have continuation of coverage option that
> you can apply for, but . . . it's likely the insurance
> rate would increase because he would no longer be part
> of the group plan.

Id. at 3.

On December 13, 2019, Dr. Erban, with Lisa Erban and Ms.
Weinstein copied, emailed Martin asking a series of questions,
including the following: 1) "[c]ould you summarize any other
benefits I am currently receiving that I need to consider
replacing?" and 2) "[o]n the topic of life insurance, how can I
get a quote from the current carrier to continue it privately?"
Dkt. 90-7 at 6. In response to the first question, Martin explained
that Dr. Erban's "dental and vision insurance would end." Id. He
also stated that "Dependent Insurance will come to an end, but you
can get a quote for that as well if you're applying for
supplemental life." Id. Martin answered the second question by
"attaching a [conversion] of coverage form." Id. He attached the
incorrect form to the email. However, after a follow-up email from
Ms. Weinstein, Martin attached the correct form to an email to
Lisa Erban, Ms. Weinstein, and Dr. Erban on December 30, 2019.

The form described three continuation options: "Life
Conversion," "Portability," and "Long Term Disability (LTD)

Conversion." Dkt. 88-8 at 3. None of the three options explained that Dr. Erban was entitled to keep his life insurance policy in place for twelve months from his last day of work if his premiums were paid. For the conversion options, the form explained that

> there is a designated timeframe during which you can exercise your coverage continuation options. To continue coverage, <u>you must mail or fax this form to request information within 15 days from the date of this notice or 31 days from your group coverage termination date,</u> <u>whichever is later</u>.

<u>Id.</u> at 2. The form also provided contact information if a participant wished to ask Hartford questions. Lisa Erban received but did not read the form and was confused about the conversion deadline. However, when presented with the form at her deposition, Lisa Erban said the deadline from the form was "clear." Dkt. 87 ¶ 51.

On February 4, 2020, Dr. Erban received a termination of employment letter from Tufts. The letter listed his termination date as February 12, 2020. Under the "Group Term Life Insurance" heading, the letter explained that "Your coverage ceases on your termination date; however, you have the option to convert your group term life insurance to an individual policy with The Hartford WITHIN 31 DAYS FROM THE DATE OF TERMINATION." Dkt. 88-10 at 1. Lisa Erban acknowledges that she saw this notice but did not submit a conversion application, explaining that she did not want to think

about her husband's death and that it was "an oversight." Dkt 88-7 at 174:11; see id. at 108:2-6; 132:4-12.

Martin never contacted Hartford to clarify whether the Sickness or Injury Continuation Provision applied to Dr. Erban's situation because he believed that TMCPOI did not have a plan of continuation.

## V.  <u>Hartford's Denial of Lisa Erban's Claim</u>

Ultimately, Dr. Erban was never able to return to work and died on September 2, 2020, a year after his diagnosis. Dkt. 87 ¶ 73. Less than a month after Dr. Erban's passing, Martin emailed Lisa Erban and Ms. Weinstein stating that:

> The Hartford, our life insurance carrier[,] reached out to me yesterday and they thought he might still be eligible for a payout under the policy. I submitted the claim. Lisa is listed as the beneficiary if the claim is approved.

Dkt. 88-17 at 1.

On October 13, 2020, Hartford contacted Martin to ask if Tufts had paid premiums on the policy post-termination. Martin informed Hartford that premiums were not paid: "[o]nce someone terminates, the employer is not involved with continued premiums. He terminated in February, so it would be up to the employee to request a continuation of coverage directly through The Hartford." Dkt. 88-18 at 1.

Six months after Martin submitted the claim, Hartford informed Lisa Erban it was denying the claim for payment under her

husband's life insurance policy for three reasons: (1) premium payments had stopped in February of 2020, thereby terminating the policy; (2) no conversion form was received by Hartford within thirty-one days after the policy terminated; and (3) Dr. Erban was not entitled to the benefit of the waiver of premium provisions in the policy because he became disabled after the age of sixty.

Lisa Erban appealed the denial to Hartford by letters dated November 29, 2021, and February 10, 2022, and to TMCPO by letters dated November 29, 2021, and March 8, 2022. On February 23, 2022, Hartford denied Lisa Erban's appeal. In its appeal denial letter, Hartford explained that:

> Dr. Erban was initially disabled on 08/14/2019 and under the Continuation of Coverage provisions his coverage could have continued had premium payments continued beyond the last day of the month of the termination of his employment. In addition, Dr. Erban could have converted his coverage to an individual policy within 31 days of the date of the termination of his employment. There are no provisions allowing for overlooking a portion of the Policy in considering the appeal. Since premium payments ceased on 02/29/2020 and Dr. Erban did not convert or port his coverage, we find that the decision to deny Life Insurance benefits [was] appropriate . . . .

Dkt. 90-6 at 12-13.

## VI.  **Procedural Background**

Lisa Erban filed this ERISA action on July 22, 2022. Tufts moved to dismiss four months later, contending that the Plan afforded no continuation right and that Lisa Erban had not plausibly alleged a breach of any fiduciary duty. The Court denied

the motion to dismiss. See Erban v. Tufts Med. Ctr. Physicians Org., Inc., 652 F. Supp. 3d 149 (D. Mass. 2023). Following discovery, the parties filed the cross-motions for summary judgment that are now before the Court.

**LEGAL STANDARDS**

## I.  Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve . . . in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome . . . under the applicable law.'" Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving party" and "draw[] all reasonable inferences" in its favor. Id. (quoting Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 408 (1st Cir. 2015)).

The party seeking summary judgment "must [first] adumbrate 'an absence of evidence to support the nonmoving party's case.'" Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (alteration in original) (quoting Brennan v. Hendrigan,

888 F.2d 189, 191 (1st Cir. 1989)). Once the movant does so, "[t]he burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact." Id. To satisfy this burden, the nonmovant "must present definite, competent evidence" demonstrating that a trialworthy issue exists. Id. (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. Kinzer, 99 F.4th at 108 (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)).

## II. **ERISA**

Lisa Erban alleges that Defendants breached their fiduciary duty under ERISA. 29 U.S.C. § 1132(a)(3) allows "a participant, beneficiary, or fiduciary" to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The Supreme Court has interpreted this provision to serve "as 'a safety net, offering appropriate equitable relief for injuries caused by violations that [29 U.S.C. § 1132] does not elsewhere adequately remedy.'" Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 110 (1st Cir. 2002) (alteration in original) (quoting Varity Corp. v. Howe, 516 U.S. 489, 512 (1996)).

Under ERISA, a fiduciary must follow a "[p]rudent man standard of care," discharging duties "solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). "ERISA's specific statutory duties are not meant to be exhaustive of a fiduciary's obligations; federal courts are expected to flesh out ERISA's general fiduciary duty clause, 29 U.S.C. § 1104(a)." Barrs v. Lockheed Martin Corp., 287 F.3d 202, 207 (1st Cir. 2002).

Although "fiduciaries need not generally provide individualized unsolicited advice," they do have an affirmative duty to convey material information when they know that silence could be harmful. Watson, 298 F.3d at 114-15; see also Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 644 (8th Cir. 2007) ("[A] fiduciary has a duty to inform when it knows that silence may be harmful . . . and cannot remain silent if it knows or should know that the beneficiary is laboring under a material misunderstanding of plan benefits." (citation omitted)); Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 380-81 (4th Cir. 2001) ("[T]he duty to inform 'entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.' . . . [A]n ERISA fiduciary that knows or should know that a beneficiary labors under a

14

material misunderstanding of plan benefits that will inure to his detriment cannot remain silent -- especially when that misunderstanding was fostered by the fiduciary's own material representations or omissions." (quoting Bixler v. Cent. Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993))).

Moreover, "[w]here the employer makes a specific commitment to notify a beneficiary about a specific event relating to plan benefits, it is at least arguable that the employer breaches its fiduciary duty if it fails to do so." Barrs, 287 F.3d at 210. A breach may also occur when a beneficiary, or an individual acting on behalf of a beneficiary, seeks information and the fiduciary responds with misleading or inaccurate information. See Brenner v. Metro. Life Ins. Co., No. 11-cv-12096, 2015 WL 1307394, at *1 (D. Mass. Mar. 23, 2015) (concluding that there could be a breach of an affirmative duty to inform where a beneficiary sought information from an HR Director about how to continue a group insurance policy, informed HR of the plan participant's serious illness, and was never told the group policy would end or was given notice of the right to convert); Bixler, 12 F.3d at 1302 (explaining a breach of fiduciary duty is possible where a beneficiary of a plan called with a specific question about a death benefit, the fiduciary had knowledge that the plan participant was

ill and had significant unpaid medical expenses, and the fiduciary still failed to advise the beneficiary to sign a notice for COBRA).

## DISCUSSION

To prevail on a claim for breach of fiduciary duty, Lisa Erban must show that: (1) Defendants acted as fiduciaries of the Plan and (2) Defendants' conduct breached their fiduciary duties under ERISA.

### I.   Fiduciary Status

A person or business entity can qualify as a fiduciary in two ways. First, an entity may be a "named fiduciary." 29 U.S.C. § 1102(a). Ordinarily, "the Plan Administrator is the 'named' fiduciary." Shields v. United of Omaha Life Ins. Co., 50 F.4th 236, 247 (1st Cir. 2022) (quoting 29 U.S.C. § 1102(a)(2)). Second, a person who is not a named fiduciary may nonetheless be a "functional fiduciary," id. at 248, "to the extent [that] he exercises any discretionary authority or discretionary control respecting management of such plan or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

Ultimately, "a person can be a fiduciary 'for some purposes and not for others.'" Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass., 66 F.4th 307, 317 (1st Cir. 2023) (quoting In re Fid. ERISA Fee Litig., 990 F.3d 50, 55 (1st Cir. 2021)). As a result, when a complaint alleges breach of ERISA

16

fiduciary duty, the Court must first answer "whether [a] person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." Id. (alteration in original) (quoting Pegram v. Herdrich, 530 U.S. 211, 226 (2000)).

In Varity, the Supreme Court held that an entity may act as a fiduciary when it "answer[s] beneficiaries' questions about the meaning of the terms of a plan so that those beneficiaries can more easily obtain the plan's benefits." 516 U.S. at 502-03. A fiduciary, the Court explained, may be liable when it misleads beneficiaries while "offer[ing] beneficiaries detailed plan information in order to help them decide whether to remain with the plan," particularly where "reasonable employees . . . could have thought that [the employer] was communicating with them both in its capacity as employer and in its capacity as plan administrator." Id. at 503.

Courts have followed Varity in holding that employers and their representatives or HR personnel may act as fiduciaries when they present themselves as sources of guidance on plan benefits. See Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 88 (2d Cir. 2001) (concluding that the employer "may have been acting as a fiduciary when it communicated with its employees and retirees concerning the contents of the welfare benefits plan"); Sprague v. Gen. Motors Corp., 133 F.3d 388, 405 (6th Cir. 1998) (finding that

an employer "may have acted in a fiduciary capacity when it explained its retirement program to the early retirees"); Livick v. Gillette Co., 524 F.3d 24, 29 (1st Cir. 2008) (distinguishing the case, where the HR representative acted ministerially, from those where an individual may be a fiduciary if they provide the employee with "misleading information while seeking advice about the security of his future benefits"); see also Taylor v. Peoples Nat. Gas Co., 49 F.3d 982, 985-89 (3d Cir. 1995) (indicating that an employee who was authorized to advise employees of their rights and options under the ERISA plan and who was understood to be the person to speak to regarding the pension plan was acting to assist the plan administrator in discharging its fiduciary duties).

Here, it is undisputed that Tufts,[1] as Plan Administrator, is a named fiduciary. Martin's fiduciary status is contested. Defendants argue that Martin was not delegated any authority to control the Plan and was merely an agent of Tufts performing ministerial tasks on behalf of the Plan. Lisa Erban contends that Tufts vested Martin, as the director of its HR department, with its fiduciary duties.

Based on the record, no reasonable jury could find that Martin was acting in a purely ministerial capacity. Martin, as director

---

[1] The parties do not dispute that TMCPO was the named fiduciary under the Plan and that, for the purposes of Plan administration, there was no difference between TMCPO and TMCPOI. See Dkt. 90-1 at 27:9-13.

of Tufts' HR department, affirmatively assumed the role of guiding the Erbans through the benefits preservation process. He invited the Erbans to direct questions about Dr. Erban's benefits to him and responded to detailed inquiries about the preservation of life insurance coverage. He provided forms, explained options, and made representations about what would happen when Dr. Erban's employment ended.

Although the parties disagree about the extent that Martin was aware of Dr. Erban's illness and cognitive abilities, it is undisputed that Martin knew Dr. Erban was not "acting like himself" on his final day of work, had a malignant brain tumor requiring surgery, and had qualified for family medical leave. Dkt. 90-1 at 53:13. Given this knowledge and his role as the Erbans' point of contact for benefits advice, Martin acted as a fiduciary in his communications with the Erbans. See Brenner, 2015 WL 1307394, at *13 (holding that HR Director acted as a fiduciary when she was aware of plaintiff's poor health conditions and "repeatedly reassured [p]laintiff that she was properly securing insurance, without ever warning [p]laintiff that her advice might be incorrect or that [p]laintiff should consult the Plan Documents for correct information").

## II.  **Breach of Fiduciary Duty**

Lisa Erban advances two theories regarding Defendants' breach of fiduciary duty: (1) their failure to inform her of the option

to continue coverage of Dr. Erban's basic and supplemental life insurance policies by continuing premium payments to Hartford under the Continuation and Sickness or Injury provisions ("Continuation Claim") and (2) their failure to adequately explain the process for converting the basic and supplemental life insurance policies to an individual policy under the conversion provision ("Conversion Claim"). The Court addresses each in turn.

### A. Continuation Claim

Lisa Erban alleges that Defendants breached their fiduciary duties under ERISA by failing to inform her that she could continue Dr. Erban's group life insurance coverage after he stopped working due to illness. Had she known, Lisa Erban argues, she would have taken the necessary steps to preserve his coverage through the final months of his life. Defendants respond that they had no such duty because no continuation right existed under the Plan.

At the motion to dismiss stage, the Court denied Defendants' bid to dismiss this claim, reasoning that the Plan language plausibly supported Lisa Erban's theory. Lisa Erban now contends that ruling is dispositive under the law of the case doctrine. It is not. That doctrine does not rigidly bind the Court to prior rulings, especially when the record has developed or new facts emerge. See Ellis v. United States, 313 F.3d 636, 647 (1st Cir. 2002) (explaining that courts may revisit prior rulings where the initial ruling was made on an inadequate record or was

preliminary). Because the initial ruling was on a motion to dismiss with a limited record and this is now a motion for summary judgment brought after discovery, reassessment at this stage is appropriate.

Two Plan provisions control. First, the Continuation Provision specifies that coverage "can be continued by Your Employer beyond a date shown in the Termination provision, if Your Employer provides a plan of continuation which applies to all employees the same way." Dkt. 88-2 at 14 (emphasis added). Second, the Sickness or Injury Provision states in relevant part that if a participant is not working "due to sickness or injury, all of [his] coverages . . . may be continued: 1) for a period of 12 consecutive month(s) from the date [he was] last Actively at Work." Id. at 15 (emphasis added).

Courts are tasked with interpreting "provisions of an ERISA benefit plan . . . guided by 'common sense principles of contract interpretation.'" Balestracci v. NSTAR Elec. & Gas Corp., 449 F.3d 224, 230 (1st Cir. 2006) (quoting Filiatrault v. Comverse Tech., Inc., 275 F.3d 131, 135 (1st Cir. 2001)). Under settled principles of contract interpretation, obligations may be trigged by a condition, which "is an event" that is "not certain to occur." Restatement (Second) of Contracts § 224 (Am. L. Inst. 1981); see Am. Priv. Line Servs., Inc. v. E. Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992) ("A condition precedent is 'an event which

must occur before a contract becomes effective or before an obligation to perform arises under the contract.'" (quoting Mass. Mun. Wholesale Elec. Co. v. Danvers, 577 N.E.2d 283, 287 (Mass. 1991))). The word "if" often introduces a condition, which signals that performance is contingent upon the occurrence of a specified event. See Restatement (Second) of Contracts § 226 cmt. a; Danvers, 577 N.E.2d at 288; see also O'Shea v. UPS Ret. Plan, 115 F. Supp. 3d 138, 151 (D. Mass. 2015) (interpreting a clause starting with "if" as a condition precedent for benefits), aff'd, 837 F.3d 67 (1st Cir. 2016).

Here, the operative condition follows the word "if": Tufts must adopt "a plan of continuation which applies to all employees." Dkt. 88-2 at 14. According to Lisa Erban, this condition is satisfied by the inclusion of the Sickness or Injury provision. Defendants counter that the condition requires Tufts to actually implement a uniform continuation program.

The Court agrees with Lisa Erban's reading. The Continuation Provision says coverage may be continued if the employer, Tufts, provided a plan of continuation for all its employees. Immediately following that sentence, the provision states that "[c]overage may not be continued under more than one Continuation Provision." Id. In the following sections, the Plan lists different Continuation Provisions, including "Leave of Absence," "Military Leave of Absence," "Family Military Leave of Absence," "Lay-Off,"

22

"Sabbatical," and "Sickness or Injury," among others. Id. at 14-15. "[I]n the context of the rest of the policy," Parmenter v. Prudential Ins. Co. of Am., 93 F.4th 13, 22 (1st Cir. 2024), the condition precedent of "a plan of continuation which applies to all employees" is satisfied by the inclusion of the subsequent Continuation Provisions, which by their own terms apply to all qualifying employees.

Defendants also rely on an email exchange between a Hartford representative and a Tufts HR representative about the responsibility for post-termination premiums. In the exchange, the Tufts HR representative asked if Hartford knew of any instance where Tufts agreed to pay employees' insurance premiums once they were terminated since "[t]ypically, those premiums . . . would be on the employee to still pay." Dkt. 88-21 at 2. The Hartford representative responded that she did "not know whether Tufts has continued to pay premiums or not" but knew of one case where it had not. Id. at 1. Defendants overread this informal exchange because it does not provide any context -- did the employee qualify for the option? Was she given the option to pay herself? The Plan's Continuation Provisions neither limit nor specify whether the employee may continue to pay the premiums. Indeed, Tufts' HR representative's question to Hartford suggests that an employee does have the option to pay herself under the Continuation Provisions.

23

Next, Defendants argue that even if continuation is generally available, the Sickness or Injury Provision did not apply once Dr. Erban's employment terminated on February 12, 2020, because at that point he was no longer absent from work "due to" sickness. As this Court previously ruled, Defendants misconstrue the plain language of the Plan. See Erban, 652 F. Supp. 3d at 158. The Plan provides that a Continuation Provision applies "beyond the date [coverage] would otherwise terminate." Dkt. 88-2 at 14 (emphasis added). The Sickness or Injury Continuation Provision does not limit the continuation of coverage due to termination. Under that Provision, coverage may be continued "for a period of 12 consecutive month(s) from the date [Dr. Erban was] last Actively at Work." Id. at 15.

Defendants cite Moss v. Unum Life Insurance Co., 495 F. App'x 583 (6th Cir. 2012), which involved similar plan language, in support of their reading. In Moss, an employee initially stopped working due to illness and was later terminated. After termination, he continued to pay premiums, but the plan administrator denied him coverage. Id. at 586. The Sixth Circuit upheld that decision under an arbitrary and capricious standard because the Continuation Provision of the plan made continuation of coverage contingent on the participant "not working due to injury or sickness" and coverage ended upon "employment terminat[ion]." Id. at 594-95. While the similar language in Moss gives pause, it is

24

distinguishable. Here, the Plan allows an employee to continue coverage for twelve months from the date the employee was "last Actively at Work," even "beyond a date shown in the Termination provision." Dkt. 88-2 at 14-15. Accordingly, unlike in Moss, the Plan here permits continuation of coverage for twelve months from the last day worked due to illness, regardless of whether an employee has been terminated.

Hartford's reading of the Plan further supports this conclusion. In its appeal denial letter, Hartford explained that "Dr. Erban was initially disabled on 08/14/2019 and under the Continuation of Coverage provisions his coverage could have continued had premium payments continued beyond the last day of the month of the termination of his employment." Dkt. 90-6 at 12 (emphasis added). Hartford ultimately denied the claim in part because the "premium payments ceased" in February 2020. Id. That is, Hartford understood the Sickness or Injury provision to permit continuation of coverage even after Dr. Erban's employment terminated, so long as the premiums remained current. Thus, although the Court finds the Plan's language unambiguous, Hartford's interpretation aligns with the Court's reading and is entitled to deference under the Plan.

Because Martin never informed the Erbans of the continuation option, including when Lisa Erban specifically asked Martin if she

could "just private pay" their current life insurance plan,[2] Dkt. 90-8 at 4, Defendants breached their fiduciary duty to provide accurate and complete information. See Watson, 298 F.3d at 114 (explaining that in some circumstances, a fiduciary must "accurately convey material information to beneficiaries"); Brenner, 2015 WL 1307394, at *1 (same); see also In re Unisys Corp. Retiree Med. Benefit ERISA Litig., 57 F.3d 1255, 1264 (3d Cir. 1995) (recognizing a duty "not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures").

**B.  Conversion Claim**

Defendants move for summary judgment on Lisa Erban's conversion claim, arguing that they provided the necessary information for her to convert Dr. Erban's basic and supplemental life insurance coverage into an individual policy. Lisa Erban argues Defendants provided insufficient guidance to ensure that the Erbans understood the conversion process and timely submitted the conversion form to Hartford. The Court considers the basic and supplemental life insurance policies in turn.

*1.  Basic Life Insurance*

---

[2] In his response, Martin stated that there is a "continuation of coverage option" but proceeded to describe the conversion process, in which individuals apply for private rates that lead to an increased premium amount. See Dkt. 90-8 at 3.

As to the basic life insurance coverage, the record reveals three written communications, each of which conveyed the conversion right and the deadline to do so. On December 6, 2019, Lisa Erban emailed Martin asking if, in the event Dr. Erban did not return to work, the Erbans could privately pay their current health and life insurance plans. Martin replied that when a participant "terminate[s] employment the life insurance policy goes away." Dkt. 90-8 at 3. He advised that the insurance company had a "continuation of coverage option that [she could] apply for," though it was "likely the insurance rate would increase because [Dr. Erban] would no longer be part of the group plan." Id. A week later, Dr. Erban emailed Martin with a question regarding life insurance, and Lisa Erban and Ms. Weinstein were copied on the email. That same day, Martin replied, "I'm attaching a continuation of coverage form." Dkt. 90-7 at 6. Martin attached the incorrect conversion form to that email but attached the correct form days later after Ms. Weinstein followed up. Lisa Erban was included on all emails. The conversion form stated in three places that the form must be mailed or faxed within 31 days from a participant's "group coverage termination date." Dkt. 88-8 at 1-2. Similar language was also in the February 4, 2020, termination letter sent to Dr. Erban.

Lisa Erban acknowledges that she received communications from Martin regarding the conversion process but argues that the

relationship between Martin and the Erbans obligated Defendants to "provide[] further guidance [than just sending the conversion form] to ensure that the Erban[s] understood the conversion process and that the conversion form was timely submitted." Dkt. 96 at 14.

Generally, plan fiduciaries need not "investigate each participant's circumstances and prepare advisory opinions for literally thousands of employees." Bowerman v. Wal-Mart Stores, Inc., 226 F.3d 574, 590-91 (7th Cir. 2000) (quoting Chojnacki v. Georgia-Pac. Corp., 108 F.3d 810, 817-18 (7th Cir. 1997)). Nor must fiduciaries ensure beneficiaries understand the terms of their insurance policies. See Electro-Mech. Corp. v. Ogan, 9 F.3d 445, 452 (6th Cir.1993) (explaining that "a fiduciary is not obligated to seek out employees to ensure that they understand the plan's provisions"); cf. Thrivent Fin. for Lutherans v. Strojny, 882 F. Supp. 2d 260, 267 (D. Mass. 2012) ("[E]ven in cases where courts have found a fiduciary duty, an insurer does not have a duty to ensure that the policy holder understands the terms of his policy."). Instead, written materials providing accurate information to beneficiaries suffice. See Frahm v. Equitable Life Assurance Soc'y of U.S., 137 F.3d 955, 961 (7th Cir. 1998) (rejecting claim that "bad advice delivered verbally entitles plan participants to whatever the oral statement promised, when written documents provide accurate information").

Defendants notified the Erbans of their right to convert the basic life insurance policy. While it might have been helpful and kind to remind Lisa Erban in person of the deadline in light of their knowledge that her husband was so sick, Defendants did not breach their duty for the conversion claim as construed in the caselaw. Therefore, the Court allows Defendants' motion for summary judgment with respect to the conversion claim for the basic life insurance.

### 2.    *Supplemental Life Insurance*

In contrast, Defendants never clearly communicated to Lisa Erban the existence of the supplemental life insurance and the need to convert that policy as well. Defendants contend they had no duty to disclose because Dr. Erban had elected and paid for the supplemental policy before his illness; in their view, he already knew of its existence and, therefore, of any need to convert it. However, Martin's knowledge of Dr. Erban's condition and his role "answering [the Erbans'] questions about the meaning of the terms of [the] [P]lan" created an affirmative duty to inform. Varity, 516 U.S. at 502–03; see Eddy v. Colonial Life Ins. Co. of Am., 919 F.2d 747, 751 (D.C. Cir. 1990); see also Vest v. Resolute Forest Prods. US, Inc., No. 17-cv-196, 2017 WL 6375964, at *4 (E.D. Tenn. Dec. 13, 2017) (citing cases regarding duty to inform and finding that there is a duty "when the plaintiff shows unique facts or circumstances that require the fiduciary to do more than is

generally required by ERISA"), aff'd, 905 F.3d 985 (6th Cir. 2018); Palen v. Kmart Corp., 215 F.3d 1327, at *4 (6th Cir. 2000) (unpublished table decision) (affirming that the employer's duty to provide information about how to continue benefits the employer administered was triggered when the employer was aware of the employee's illness, if not his impending death).

None of Defendants' communications with the Erbans clearly communicated that a $400,000 supplemental policy was in force and required conversion. In an email on December 13, 2019, after Dr. Erban specifically asked Martin to "summarize any other benefits [he was] currently receiving" and might need to replace, Martin listed dental, vision, dependent insurance, and a 457B plan. His only reference to supplemental life insurance was conditional: "Dependent Insurance will come to an end, but you can get a quote for that as well if you're applying for supplemental life." Dkt. 90-7 at 6. The phrase "if you're applying" could reasonably be understood as a coverage that one could newly apply for, not an existing policy. The February 4, 2020, termination letter included a generic section captioned "Optional Life Insurance," Dkt. 88-10 at 2, but likewise failed to identify that Dr. Erban had an existing supplemental policy subject to the thirty-one-day deadline.

Based on the undisputed facts, Defendants failed to provide complete and accurate information about the supplemental life

insurance. See Bowerman, 226 F.3d at 591 ("If the written materials are inadequate, then the fiduciaries themselves must be held responsible for the failure to provide complete and correct material information . . . ." (cleaned up); Watson, 298 F.3d at 114-15 (holding that a fiduciary has a duty to inform a participant of available benefits if the fiduciary should know failure to do so would be harmful); Brenner, 2015 WL 1307394, at *1 (same); see also In re Unisys Corp., 57 F.3d at 1264 (recognizing a duty "not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures"). Summary judgment is therefore allowed in Lisa Erban's favor with respect to the supplemental-policy portion of her conversion claim.

## III. **Surcharge Damages**

Lisa Erban seeks "surcharge damages in the full amount of the policies." Dkt. 91 at 5. Surcharge damages are designed to make plaintiffs "whole from an actual loss that resulted from a fiduciary's breach of duty." Est. of Smith v. Raytheon Co., 573 F. Supp. 3d 487, 509 (D. Mass. 2021). The parties dispute whether such damages are an equitable remedy under § 502(a)(3) of ERISA, which empowers beneficiaries "to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3).

The First Circuit has not addressed whether surcharge damages are available under § 502(a)(3), and other circuit courts are divided on the issue. The circuits that recognize surcharge as a

form of relief under § 502(a)(3) rely on the Supreme Court's decision in CIGNA Corp. v. Amara, 563 U.S. 421 (2011). See, e.g., Trs. of N.Y. State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC, 102 F.4th 572, 603-604 (2d Cir. 2024); Gearlds v. Entergy Servs., Inc., 709 F.3d 448, 452 (5th Cir. 2013); Kenseth v. Dean Health Plan, Inc., 722 F.3d 869, 882-83 (7th Cir. 2013)); Silva v. Metro. Life Ins. Co., 762 F.3d 711, 722 (8th Cir. 2014); Guenther v. Lockheed Martin Corp., 972 F.3d 1043, 1050 (9th Cir. 2020); Gimeno v. NCHMD, Inc., 38 F.4th 910, 914-15 (11th Cir. 2022).

In Amara, employees challenged their employer's adoption of a new pension plan without proper notice. 563 U.S. at 424. The district court found that the employer intentionally misled its employees and, as a remedy, reformed the ERISA plan. Id. at 431, 433. The Supreme Court vacated and remanded, concluding that § 502(a)(1)(B) did not authorize courts to reform plan terms. Id. at 435-38. While holding that reformation was not an available remedy under that provision, the Court analyzed § 502(a)(3)'s catch-all phrase "other appropriate equitable relief" and concluded that surcharge -- make-whole monetary relief traditionally imposed on trustees -- falls within its ambit. See id. at 442. The Supreme Court explained that, before the merger of law and equity, a "surcharge remedy extended to a breach of trust committed by a fiduciary" and was "exclusively equitable." Id.

(quoting Princess Lida of Thurn & Taxis v. Thompson, 305 U.S. 456, 464 (1939)). Because the employer in Amara stood in the shoes of a trustee, the Court explained that surcharge fit comfortably within "appropriate equitable relief" under § 502(a)(3). See id.

Defendants urge this Court to reject Amara and follow the Fourth Circuit's approach in Rose v. PSA Airlines, Inc., 80 F.4th 488 (4th Cir. 2023), cert. denied, 144 S. Ct. 1346 (2024). In Rose, the Fourth Circuit denied "make-whole" monetary relief as an available remedy under § 502(a)(3). See id. at 504. In its analysis, the Fourth Circuit reasoned that Amara's discussion of surcharge remedy was dicta that the Supreme Court later rejected in Montanile v. Board of Trustees of the National Elevator Industry Health Benefit Plan, 577 U.S. 136 (2016). See Rose, 80 F.4th at 502-03. But Montanile concerned a beneficiary insured by an ERISA plan that paid the medical expenses the beneficiary incurred after a drunk driver seriously injured him. See 577 U.S. at 140. The beneficiary successfully sued the drunk driver and received a settlement. See id. The ERISA plan administrator then sued the beneficiary for reimbursement from the settlement, to which it was entitled by the terms of the ERISA plan. See id. at 139-40. The Supreme Court held that when an ERISA plan participant untraceably dissipates a third-party settlement, § 502(a)(3) does not allow a plan fiduciary to bring suit to attach the participant's personal

33

assets. See id. at 139. The Montanile Court mentioned Amara in a footnote, explaining that Amara

> reaffirmed that "traditionally speaking, relief that sought a lien or a constructive trust was legal relief, not equitable relief, unless the funds in question were 'particular funds or property in the defendant's possession.'" In any event, the Court's discussion of § 502(a)(3) in [Amara] was not essential to resolving that case, and . . . our interpretation of "equitable relief" in [our prior cases] remains unchanged.

Id. at 148 n.3 (citation omitted) (quoting Amara, 563 U.S. at 439).

Montanile is distinguishable from the present case. In Montanile, the Supreme Court was concerned with a plaintiff seeking surcharge damages from a non-fiduciary. In contrast, the defendant was a fiduciary in Amara, and Defendants are fiduciaries in the present case. Defendants' role as fiduciaries here is "critical" because fiduciary-defendants are "analogous to . . . trustee[s]" and surcharge damages were historically an equitable remedy available against trustees. Amara, 563 U.S. at 442; see also Aramark Servs., Inc. v. Aetna Life Ins. Co., No. 23-cv-00446, 2024 WL 1839465, at *4 (E.D. Tex. Apr. 26, 2024) (holding that Montanile did not overrule Amara).

Recognizing surcharge relief as an equitable remedy under § 502(a)(3) also furthers ERISA's goal of "provid[ing] the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of fiduciary duty," Brotherston v. Putnam Invs., LLC, 907

F.3d 17, 31 (1st Cir. 2018) (quoting <u>Eaves v. Penn</u>, 587 F.2d 453, 462 (10th Cir. 1978)), and aligns with how other district courts in this Circuit have ruled, <u>see, e.g.,</u> <u>Est. of Smith</u>, 573 F. Supp. 3d at 509 (recognizing surcharge as a potential remedy); <u>Turner v. Liberty Mut. Ret. Benefit Plan</u>, No. 20-cv-11530, 2023 WL 5179194, at *6 (D. Mass. Aug. 11, 2023) (same). Accordingly, the Court holds that § 502(a)(3) permits a participant to seek surcharge against a fiduciary and denies Defendants' motion for summary judgment on that point.[3]

**ORDER**

For the foregoing reasons, the Court **<u>ALLOWS</u>** Defendants' motion for summary judgment (Dkt. 85) with respect to Lisa Erban's basic life insurance conversion claim and otherwise **<u>DENIES</u>** the motion. The Court **<u>ALLOWS</u>** Lisa Erban's motion for summary judgment (Dkt. 89) with respect to her continuation claim and supplemental claim. Because the parties have not briefed the amount of damages to be awarded as equitable relief, they shall file a joint status report with the Court within fourteen days of this Order either with an agreed-upon amount or with a proposed briefing schedule to determine the appropriate amount.

---

[3] Because the Court grants relief on Lisa Erban's supplemental life insurance conversion claim under ERISA § 502(a)(3), including the availability of surcharge as an equitable remedy, it need not reach the alternative theory of equitable estoppel.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge